UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 19-10113-FDS |
| | ) | |
| LOUIS D. COLEMAN, III. | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S**
**OPPOSITION TO HIS MOTION TO COMPEL DISCOVERY**

Defendant, Louis D. Coleman, III, replies to the government's opposition to his motion to compel. He will reply to the government's sealed opposition in a separate sealed reply.

The government has agreed to disclose the statement that Mr. Coleman made shortly after his arrest to the Providence Police. It opposes the portions of Mr. Coleman's motion that seeks Jassy Correia's criminal history information and the recordings and reports associated with law enforcement's interview of Ms. L.H.

**Summary**

The government takes no issue with the legal standard Mr. Coleman relied upon to support his motion to compel. (Gov. Resp. at 2 (acknowledging its duty to provide mitigating information under Brady)). Instead, the government's opposition runs long on allegations that counsel for Mr. Coleman relied upon an "extremely misleading"—or at times "not true"—recitation of the facts. (See Gov. Resp. at 1, 16, and 17). Mr. Coleman stands behind his factual scenario.

Despite the government's accusatory tone, it either concedes or does not contest many of the facts relied upon by Mr. Coleman to support his motion. The government's opposition, then, reveals no material factual disagreement. Application of these conceded or uncontested facts to the agreed upon legal standard entitles Mr. Coleman to the evidence he has requested.

1

### I. The Court should order the government to produce Jassy Correia's criminal record information because it is mitigating.

A defendant has a constitutional right to put before the jury as a mitigating factor any circumstance of the offense that he proffers as a basis to a sentence less than death. (Motion at 5 (citing United States v. Tsarnaev, 968 F.3d 24, 68 (1st Cir. 2020) and Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality op.)) The standard for what is mitigating information is broad and "encompasses any evidence which tends to logically prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Motion at 5 (citing Tsarnaev, 968 F.3d at 68 and Smith v. Texas, 543 U.S. 37, 44 (2004). This "is why the normally low relevance threshold in noncapital cases is lower still when it comes to mitigation evidence in capital cases …" Tsarnaev, 968 F.3d at 68.

The government does not dispute the relevant legal standard. (Gov. Resp. at 2). What it disputes is whether Mr. Coleman has met that standard. (Gov. at 2 ("[T]here is no credible basis for claiming that the requested information is *Brady* material"). Mr. Coleman disagrees.

Mr. Coleman seeks Ms. Correia's criminal history information because it supports the position that the alleged offense was a sudden altercation rather than a planned and executed stalking, kidnapping, and murder. A sudden altercation and a lack of a plan would mitigate against the imposition of a death sentence. (Motion at 9). As explained below, the government does not seriously dispute many of the facts that Mr. Coleman relied upon in his motion.

The government does not dispute—as Mr. Coleman said in his motion—that Ms. A.H. told law enforcement that Ms. Correia had a "habit of getting really drunk" and "messy" to the point of being maced and physically pulled off people. The government also does not dispute that the toxicology report which shows that Ms. Correia had alcohol, amphetamines, cocaine, and cannabinoids in her system. It concedes that Ms. Y.M. told law enforcement they had "smoked" earlier that day. (Gov. Resp. at 17). Despite the toxicology report and Ms. Y.M.'s statement that the

two "smoked," the government takes the position that Ms. Correia was "not in such a state that night." The government also disputes that Mc. Correia was visibly intoxicated. (Gov. Resp. at 16). Mr. Coleman based his assessment upon Ms. Y.M.'s statement, the toxicology report, and the surveillance video. (See Sealed Exh. LC 1444 (Ms. Correia with Uber); Sealed Exh. LC 1445-1447 (Ms. Correia and friends in the alleyway); Sealed Exh. A (Ms. Correia and friends leaving Venu)). The government implies that Ms. Correia may have ingested substances while with Mr. Coleman, but it has not disclosed evidence to support that conclusion.

The government also does not dispute Ms. Y.M.'s statement to law enforcement that "the liquor must have gotten the best of [Ms. Correia]" when she was arrested for fighting in Atlanta a couple of month previous. (Motion at 8). Instead of contesting Y.M.'s statement by showing the absence of alcohol and fighting related arrests, the government says that Ms. Correia "was not responsible for any fighting on the night she was killed." (Gov. Resp. at 17).

However, the government does not materially dispute Mr. Coleman's position that "Ms. Correia and Ms. Y.M. engaged in verbal and physical altercations throughout the night" and that "pushing and shoving occurred between the two." Motion at 2.[1] Evidence of this appears plainly on surveillance footage.[2] Additionally, the government says Mr. R.T. told law enforcement that Ms. Correia and Ms. Y.M. had argued and "put[] hands on one another" that night. (Gov. Resp. at 7).

Choosing to focus elsewhere, the government says that Ms. Correia and Ms. Y.M. went into Venu's bathroom and when they returned Ms. Y.M. was angry while Ms. Correia was "cool." (Gov. Opp. at 7). No surveillance video has been produced from the bathroom. Mr. Coleman assumes

---

[1] What the government disputes is what it says is "the clear implication" made by Mr. Coleman that "the victim was at least equally, if not primarily, responsible for the physical altercation." (Gov. Resp. at 3; Id. at 14).

3

there is none. Accordingly, the parties cannot readily confirm if an altercation occurred in the bathroom, and if so, which of the two women acted as the aggressor.

However, the altercations that Mr. Coleman relied upon in his motion occurred in the alleyway and on Tremont Street, well after the possible bathroom incident. Surveillance cameras captured those incidents with Ms. Correia wearing bright orange pants that were part of a body suit. They arose in fits and starts with each woman acting in a way that can be credibly described as aggressive.

For instance, at one point in the alleyway, Ms. Correia and Ms. Y.M. can be seen yelling at each other, then Ms. Y.M. shoves Ms. Correia and Ms. Correia kicks off her high-heeled shoes and yells at Ms. Y.M. (Sealed Exh. LC 1446 at 2:11:30 a.m.). Ms.

The government agrees saying, "It is true" that "the victim kicked off her shoes, and that she and Y.M. had an angry conversation." (Gov. Resp. at 8; 14). The government also notes that Ms. Correia "had had enough and was going to fight." (Gov. Resp. at 7).

The government also does not materially dispute what happened a few moments later. While still in the alleyway, Ms. Y.M. turned in the opposite direction and walked away from Ms. Correia. (Sealed Exh. LC 1446 at 2:11:28 a.m. to 2:11:40 a.m.). Rather than let her go, Ms. Correia followed her and grabbed Ms. Y.M.'s arm. (Sealed Exh. LC 1446 at 2:11:42 a.m. to 2:11:44 a.m.).

The government mostly agrees saying that "Y.M. turned around and walked back down the alley" and "the victim followed" her. (Gov. Resp. at 8).

What happens thereafter is also notable. Ms. Y.M. is backed up against the outside of a building that abuts the alleyway. Ms. Correia stands in front of her. The two appear to exchange angry words. (Sealed Exh. LC 1447 at 2:12:39 a.m. to 2:13:20 a.m.). Ms. Y.M. again turns to leave, and Ms. Correia again follows her. (Id).

Thus, the accusatory tone aside, the government's opposition produces no material disagreement with Mr. Coleman's assertion that "Ms. Correia and Ms. Y.M. engaged in verbal and physical altercations throughout the night" and that "pushing and shoving occurred between the two." Motion at 2.

The government also concedes, or does not contest, much of Ms. Correia's interaction with the Uber driver. Once Ms. Correia and Ms. Y.M. parted ways on Tremont Street, Ms. Correia approached an Uber that had been idling curbside. (Gov. Opp. at 9; Motion at 2-3). The government concedes that Ms. Correia "tapp[ed]," "knock[ed]," and "slapped" the Uber's window (Gov. Opp. at 10, 11). It also agrees that she "appeared to try to open the rear passenger-side door" (Gov. Opp. at 10) and that she ultimately "opened the front passenger-side door and entered the Uber." (Gov. Opp. at 10-11). The government also seems to concede that Ms. Correia had not hailed the Uber: "It is true that she tried to persuade the Uber driver to drive her, and in so doing both said she would call the police and that she was going to make him her Uber driver." (Gov. Opp. at 15-16). In further agreement with Mr. Coleman, the government says, "[S]he did get into the front passenger seat, where she remained for all of nine seconds before the Uber driver pushed her out onto the sidewalk and closed the door." Once outside the Uber, Ms. Correia threw something at the Uber's front window that the government thinks was snow. (Gov. Opp. at 11).

Immediately thereafter, Ms. Correia and Mr. Coleman met on the sidewalk, spoke, and walked away together. (Sealed Exh. LC 1444 at 2:16:43 a.m.). Ms. Correia did not have shoes on her feet. Mr. Coleman gave her a piggyback ride to his car. (Sealed Exh. LC 1481).[3] The government

---

[3] Another couple on surveillance video can be seen with the woman being carried piggyback style on the man's back. (Sealed Exh. LC 1444 at 02:12:28 a.m. to 02:12:32 a.m.).

incorrectly says Mr. Coleman utilized a fireman's carry to transport Ms. Correia. A fireman's carry is a distinctly different maneuver that arguably suggests the subject is incapacitated.[4]

Finally, the government concedes that Mr. Coleman presented with injuries after his arrest (Gov. Opp. at 2) and that Ms. Y.M. told law enforcement that she had injuries. (Gov. Opp. at 3). Ms. Y.M. told law enforcement that, "[B]y that time, I had a black eye, I had a red mark under my eye, I have scratches on my back like I was dragged out of a vehicle." (LC 1821 at 17:05 to 17:12). "Like, I was assaulted." (LC 1821 at 17:16 to 17:17). Thus, the fact of injury is not contested. What the government contests is how and when the injuries occurred. (Gov. Opp. at 17-18). The government says it "believes [Ms. Y.M.] was indicating she sustained these injuries during her interaction with A.H. and R.T." (Gov. Opp. at 17). However, law enforcement asked her, "Okay, do you think it was from your fight with [Ms. A.H.], or you don't know?" (LC 1821 at 17:17 to 17:21) Ms. Y.M. responded, "Now, okay, so, I don't wanna say because I don't remember that, you know." (LC 1821 at 17:21 to 17:28).

Mr. Coleman concedes that in his motion he said Ms. Y.M. acknowledged her fighting with Ms. Correia. That assertion was mistaken. The mistake is not material, however, because surveillance video plainly shows the two engaging in physical and verbal altercations.

Application of the above conceded or uncontested facts to the agreed upon legal standard shows that the government should produce Ms. Correia's criminal history information. To prevail at the discovery stage, Mr. Coleman must show that the evidence he seeks tends to logically prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value. See Motion at 5 (citing Tsarnaev, 968 F.3d at 68 and Smith, 543 U.S. at 44). His position is that a sudden altercation occurred and that he did not plan and then execute a stalking, kidnapping, and murder.

---

[4] https://www.youtube.com/watch?v=dCQh1K6m1V8

If Ms. Correia has an arrest record associated with being under the influence and getting into altercations—as both Ms. A.H. and Ms. Y.M. suggest—then that evidence tends to logically prove that a sudden altercation may have occurred on the night of her murder. Especially where discovery shows that: (1) Ms. Correia had multiple intoxicating substances in her system; (2) Ms. A.H. said that Ms. Correia had a habit of getting really drunk and messy to the point of being maced and physically pulled off people; (3) Ms. Correia and Ms. Y.M. had—after drinking and smoking—engaged in verbal and physical altercations; and (4) Ms. Correia and an Uber driver had an altercation that resulted in her being push torso-first out of the Uber and landing on the sidewalk. A fact-finder could reasonably deem this information to mitigate against the imposition of a death sentence because it tends to explain that no plan to stalk, kidnap, and then murder Ms. Correia existed. Notably, the government cites no cases to counter those cited by Mr. Coleman wherein a court ordered the government to produce the victim's criminal history information.

In the end, the government opposed Mr. Coleman's request for Ms. Correia's criminal history information by saying he had relied upon an extremely misleading or not true version of the facts. However, once scrutinized, the government's opposition concedes or does not contest the existence of most of the facts that Mr. Coleman relied upon. While the government may choose to tell a different narrative with the facts, it should not prevent Mr. Coleman from presenting his narrative based that is based on those same facts; especially where the "normally low relevance threshold in noncapital cases is lower still when it comes to mitigation evidence in capital cases …" Tsarnaev, 968 F.3d at 68.

**II.    The Court should order the government to produce the reports memorializing law enforcement's interview with Ms. L.H. because it is mitigating and may help defeat an element of the offense.**

Mr. Coleman believes the same standard from above applies to Ms. L.H.'s statements to law enforcement. The government, however, first raises two contradictory defenses. Initially, it suggests

that Mr. Coleman is not entitled to witness statements until after that witness's direct testimony. (Gov. Opp. at 19 (citing U.S.C. § 3500, the Jencks Act)).

The Jencks Act cannot justify the government's nondisclosure of exculpatory information. Due process requires the government to disclose information favorable to the accused when the information is material to either guilt or punishment. The Jencks Act is inconsistent with due process where the exculpatory information is contained within witness statements or reports. See United States v. Snell, 899 F. Supp. 17, 21 (D. Mass. Aug. 25, 1995) (Gertner, J.). "In seeking to harmonize the Jencks Act and *Brady*," due process prevails. Id. ("[I]t makes no sense to indulge in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks."); see also, United States v. O'Brien, 2013 WL 1057928 at *5 (D. Mass. Mar. 13, 2013, unrep.) (Sorokin, M.J.) ("To the extent such information is exculpatory within the meaning of *Brady* or Local Rule 116.2(a), the government must produce the information pursuant to the deadline established in this Order, rather than the later time of Jencks disclosure); United States v. Owens, 933 F.Supp. 76, 79 (D. Mass. June 24, 1996) (Young, D.J.); Ferrara v. United States, 384 F. Supp.2d 384, 425 & n.20 (D. Mass. April 12, 2005) (Wolf, D.J.); United States v. Perry, 37 F. Supp.3d 546, 560-61 (D. Mass Aug. 1, 2014) (Casper, D.J.).

Other courts have agreed with courts from this district. See e.g., United States v. Trie, 21 F.Supp. 2d 7, 26 (D.D.C. July 17, 1998) (Friedman, D.J.); United States v. McVeigh, 923 F. Supp. 1310, 1315 (D. Colo. Apr. 29, 1996) (Matsch, C.J.); United States v. Starusko, 729 F.2d 256, 265 (3rd Cir. 1984) ("Where a [district] court has ruled that impeachment material falls more under Brady, instead of or in addition to, the Jencks Act, and orders it disclosed, the defendant has received a guarantee of protection.").

After raising the Jencks Act, the government suggests that witness statements memorialized in law enforcement reports are outside the Jencks Act. (Gov. Opp. at 19 ("And here the document is

8

not even the statement of L.H. in any event: it is the statement of an FBI agent regarding what he understood L.H. to have said.")) The government is mistaken. The definition of a statement includes "a substantially verbatim recital of an oral statement" which would include statements memorialized within law enforcement reports. See 18 U.S.C. § 3500(e)(2). The government's position does beg the question, "If L.H.'s statement is not Jencks material then under what theory does it decline to produce it?"

      Mr. Coleman and Ms. L.H. had not met before seeing each other in Venu. Thus, her statement to law enforcement could only cover their interaction while in the club and the few text messages they exchanged afterwards. The text messages have been produced. Mr. Coleman believes that L.H.'s statement will include an explanation of the interaction inside the club, including whether he was interacting with, lingering around, or stalking Ms. Correia and her statement will illustrate that their interaction inside the club was typical of club goers—they talked and danced. (See Sealed Exh. B, video of Mr. Coleman and Ms. L.H. interacting inside Venu). This information tends to logically show that the offense was not a planned stalking, kidnapping, and murder. The lack of a planned stalking, kidnapping, and murder could reasonably be deemed to mitigate against a death sentence. See Motion at 5 (citing Tsarnaev, 968 F.3d at 68 and Smith v. Texas, 543 U.S. 37, 44 (2004).

      The government also counters Mr. Coleman's position saying no one has alleged that the defendant stalked Ms. Correia while inside venue. The elements of kidnapping include an unlawful inveiglement or an unlawful decoy and the government alleges these elements in its indictment. (D.E. 15). Moreover, the government seems to rely on these elements in its opposition. (See Gov. Opp. at 4 (noting that Mr. Coleman watched from the sidewalk on Tremont Street for 40 seconds as Ms. Correia interacted with the Uber); at 19 ("What the defendant did on Tremont Street when he saw the victim was having trouble getting home is another matter.")).

The facts that Mr. Coleman did not interact with, linger around, or stalk Ms. Correia while inside Venu logically counters the inveiglement and decoy elements of the kidnapping offense, and therefore, the information is exculpatory as to an element of the offense charged.

Finally, the government confuses the couple's interaction while inside the club with the texting that occurred after leaving the club.[5] The texting that occurred afterwards does not speak to the details of their interaction inside the club. Ms. L.H.'s statement to law enforcement does.

## Conclusion

For the foregoing reasons the Court should grant Mr. Coleman's motion for discovery and order the government to disclose Jassy Correia's criminal record information and law enforcement reports memorializing Ms. L.H.'s statement.

> LOUIS D. COLEMAN, III
> By his Attorneys,
>
> */s/ Wade Zolynski*
> Wade Zolynski
>   MT Bar No. 6088
> */s/ Jane Peachy*
> Jane Peachy
>   B.B.O. No. 661394
> Federal Defender Office
> 51 Sleeper Street
> Boston, MA  02210
> Tel: 617-223-8061
>
> */s/David P. Hoose*
> David P. Hoose
>   B.B.O. No. 239400
> Sasson, Turnbull, Ryan & Hoose
> 100 Main Street
> Northampton, MA 01060
> Tel: 413-586-4800 Ext. 107

---

[5] The media, in reporting about this discovery-based litigation, has inaccurately said that Ms. L.H. and Ms. Correia were friends. (See https://www.bostonglobe.com/2020/09/11/metro/man-charged-death-jassy-correia-texted-her-friend-after-allegedly-strangling-her-prosecutors-say/). The government has not produced discovery indicating any relationship between the two women.

## CERTIFICATE OF SERVICE

      I, Wade Zolynski, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 21, 2020.

                                              */s/ Wade Zolynski*
                                              Wade Zolynski