UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 19-10113-FDS |
| | ) | |
| LOUIS D. COLEMAN, III | ) | |

## **DEFENDANT'S PROPOSED PROTOCOL FOR SELECTION OF JURORS**

The defendant, Louis Coleman, hereby moves this Court to adopt the following proposed protocol for a selecting a jury in this case. The complexity of this prosecution, the extensive media coverage of the case, and the sensitive nature of the issues involved in this case warrant the need for a thorough exploration of potential jurors' prejudices and biases so as to guarantee Mr. Coleman's Sixth Amendment right to an impartial jury and his Fifth Amendment due process rights.

Jury impartiality is a core requirement of the right to trial by jury guaranteed by the U.S. Constitution. *See Morgan v. Illinois*, 504 U.S. 719, 727 (1992) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." (internal citations omitted)). The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI (emphasis added). An impartial jury is one that has not formed an opinion prior to hearing and assessing all of the evidence, and one that bases its decision only on the assessment of evidence not on pre-formed conclusions and biases." *See Morgan*, 504 U.S. at

1

727. Voir dire plays a critical function in protecting the right to an impartial jury. *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Because of the crucial function of the peremptory challenge in acquiring an impartial jury, a "system for the impaneling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right must be condemned." *Pointer v. United States*, 151 U.S. 396, 408–09 (1894).

With these core constitutional principles in mind, Mr. Coleman requests the following protocol for selection of a jury in this case:

I.    *Educational Video on Implicit Bias*

First, Mr. Coleman asks that this Court show a video to all prospective jurors in this case educating them about implicit or unconscious bias. "Implicit bias" is a term of art referring to the formation of opinions based on "relatively unconscious and relatively automatic features of prejudiced judgment and social behavior." *See* Brownstein, Michael, "Implicit Bias," The Stanford Encyclopedia of Philosophy (Spring 2017 Edition), Edward N. Zalta (ed.), available at https://plato.stanford.edu/entries/implicit-bias. In order words, implicit bias draws conclusions based on pre-formed opinions rather than the evidence presented. In terms of juror impartiality, "[t]he theory of the law is that a juror who has formed an opinion cannot be impartial." *Morgan*, 504 U.S. at 727 (internal citation omitted). Drawing conclusions on the basis of "implicit racial bias" would contravene the core principle of impartiality of the Sixth Amendment.

The research group Perception Institute[1] offers the following definition of

---

[1] According to its website, the Perception Institute is a national consortium of social scientists, law professors, and advocates focusing on the role of the mind sciences in law, policy, and institutional practices. Its cofounders are Alexis McGill Johnson, of Princeton and Yale Universities, and Seton Hall University School of Law Professor Rachel Godsil, renowned author and lecturer on issues of implicit bias and racial anxiety. *See* https://perception.org/about-us/team/.

"implicit bias" in the context of race –

> Thoughts and feelings are "implicit" if we are unaware of them or mistaken about their nature. We have a bias when, rather than being neutral, we have a preference for (or aversion to) a person or group of people. Thus, we use the term "implicit bias" to describe when we have attitudes towards people or associate stereotypes with them without our conscious knowledge. A fairly commonplace example of this is seen in studies that show that white people will frequently associate criminality with black people without even realizing they're doing it.

"Implicit Bias," Perception Institute, available at https://perception.org/research/implicit-bias/.

The Sixth Circuit has explained the concept this way:

> The concept of "implicit bias" is defined, generally, as bias that is "not necessarily openly and explicitly expressed, but [is] harbored nonetheless." Implicit biases are "often not conscious, intentional, or maliciously-based," as opposed to explicit bias – generally defined as "bias that is openly expressed."

*United States v. Ray*, 803 F.3d 244, 260-61 (6th Cir. 2015) (citing Melissa L. Breger, *The (in)visibility of Motherhood in Family Court Proceedings*, 36 N.Y.U. Rev. L. & Soc. Change 555, 560 (2012). Associate Justice Kenneth Desmond of the Massachusetts Appeals Court has said, "[i]n the most basic sense, implicit bias is 'thoughts about other people you didn't know you had.' Consequently, it is often difficult for individuals who do not fall victim to the impact of certain biases to identify the ways they are manifested." Hon. Kenneth V. Desmond, Jr., *The Road to Race and Implicit Bias Eradication*, Boston Bar J., Summer 2016, at 3, available at https://bostonbarjournal.com/2016/07/13/the-road-to-race-and-implicit-bias-eradication/.

A plethora of scholarly articles support that implicit social bias poses a challenge to legal theory and practice, and to jury selection in particular because unconscious bias can lead to erroneous assumptions that contravene the accused's Sixth Amendment right to a trial by an impartial jury. *See e.g., Ray*, 803 F.3d at 260–61 (citing Mark W. Bennett, *Unraveling the*

*Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge–Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 152 (2010); Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. REV. 465, 465 (2010); Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 DUKE L.J. 345, 345 (2007)). *See also* Anna Roberts, *(Re)forming the Jury: Detection and Disinfection of Implicit Juror Bias*, 44 Conn. L. Rev. 827, 833 (2012); Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 UC Irvine L. Rev. 843, 844 (2015) ("'Implicit biases' are discriminatory biases based on either implicit attitudes-feelings that one has about a particular group-or implicit stereotypes-traits that one associates with a particular group. They are so subtle that those who hold them may not realize that they do. . . African-Americans, for example, are stereotypically linked to crime and violence; their behavior is more likely to be viewed as violent, hostile, and aggressive than is the behavior of whites; and they are more readily associated with weapons than are whites."); Dale Larson, *A Fair and Implicitly Impartial Jury: An Argument for Administering the Implicit Association Test During Voir Dire*, 3 DePaul J. for Soc. Just. 139, 154 (2010) ("Implicit bias against socially underprivileged groups and outgroups is prevalent in our culture. As a result, there is a chance that implicit bias is present anytime a member of such a group is the defendant in a criminal trial."); Siegfried C. Coleman, *Reliance on Legal Fiction: The Race-Neutral Juror*, 41 S.U. L. Rev. 317 (2014) ("This article highlights the notion that these unchecked biases are alive and well in all jurors as an innocent and necessary human characteristic and advocates the position that these biases should be acknowledged and formally addressed."); Hon. Kenneth V. Desmond, Jr., *The Road to Race and Implicit Bias Eradication*, Boston Bar J., Summer 2016, at 3

4

("Throughout the past several decades, State and Federal appellate courts have candidly acknowledged the implicit biases of litigants and jurors."); Justin D. Levinson, et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 Ohio St. J. Crim. L. 187 (2010) (study confirmed hypothesis that study participants held strong associations between "black" and "guilty," relative to "white" and "guilty," and implicit associations predicted the way mock jurors evaluated ambiguous evidence); Tara Mitchell, et a, *Racial Bias in Mock-Juror Decision-Making: A Meta-Analytic Review of Defendant Treatment*, 29 Law and Hum. Behav. 621, 627-28 (2005) (meta-analysis of 34 mock jury studies involving 7,000+ participants revealed statistically significant association between defendants' race and verdicts, with mock jurors less likely to vote to convict a same-race defendant than defendant of different races).

This emerging social science serves to highlight something about which the courts have long been aware: that unconscious race bias could affect the outcome of trials. *See Smith v. Phillips*, 455 U.S. 209, 221-222 (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult because the juror may be … unaware of it."); *Georgia v. McCollum*, 505 U.S. 42, 68 (1992) (O'Connor, J., dissenting) ("It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence."). Where voir dire and inquiry into racial bias and prejudice are required under the Fourteenth Amendment in certain cases, *see Ham v. South Carolina*, 409 U.S. 524, 527 (1973), and where implicit bias is inextricably linked to and rooted in pervasive and unconscious race biases, so too does the Fourteenth Amendment demand voir dire and inquiry into prospective jurors' implicit biases. *See Pena-Rodriguez*, 137 S.Ct. at 868 (granting new trial where juror relied on racial

stereotype and animus to convict the defendant, recognizing that "racial bias implicates unique historical, constitutional, and institutional concerns").

"Time and again, [courts are] called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system." *Pena-Rodriguez*, 137 S.Ct. at 867. Despite the best efforts of courts across the country and in Massachusetts to root out bias amongst potential jurors, racial bias still seeps into the jury room, as demonstrated by the SJC's recent decision in *Commonwealth v. McCalop*. 485 Mass. 790 (2020) (reversing trial judge's denial of motion for juror names and contact information where deliberating juror disclosed to defense counsel that she was surprised to see the amount of racism vocalized during the deliberations by several of the jurors who voted to find the defendant guilty); *see also Pena-Rodriguez, supra* (allowing inquiry into jury deliberations in a case where juror reported that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict).

Current guidance reflects that people can combat the effect of implicit biases if they are aware that unconscious associations can exist and consciously examine whether such associations may have played a role in their own decisions.[2]  For this reason, one federal district court – the U.S. District Court for the Western District of Washington – actively educates all prospective jurors to do the same. That court does so by showing an 11-minute video as a routine

---

2 *See, e.g.*, FJC, Hon. Jeremy D. Fogel, Director, *Mindfulness and Judging* (2016), available at: https://fjc.dcn/content/345454/court-web-discussion-implicit-bias; *see also* E. Ingriselli. *Mitigating Jurors' Racial Biases: The Effects of Content and Timing of Jury Instructions*, 124 Yale L. J. 1690, 1729-30 (March 2015) (examining hypotheses for combatting racially driven decisions in jurors and concluding that "judges should include debiasing elements derived from [implicit bias] theory in their jury instructions and . . . they should present these instructions before the evidence phase of a trial" because "presenting instructions before evidence leads to lower biases").

part of juror orientation.[3]  The video explains what implicit biases are and instructs jurors to

guard against drawing inferences or conclusions based on them by taking three simple steps: (1)

being aware that implicit biases exist, (2) carefully examining their own decision making

process, and (3) asking whether their decision(s) would be different if the witness, lawyer, or

person on trial were of a different race, age or gender. Mr. Coleman asks that this Court show the

venire in this case the video created by the Western District of Washington.[4]  In the alternative,

Mr. Coleman asks that the Court show the venire the "What Would You Do" stolen bicycle

video[5] to demonstrate how implicit bias can affect people's actions and reactions in the real

world.

> II.    *Juror Questionnaire*

Second, Mr. Coleman has submitted an extensive questionnaire for potential jurors called

to serve in this case. The questionnaire asks questions tailored to this case that are designed to

reveal any bias or prejudice a juror might have that would prevent him or her from being a fair

and impartial juror in this case. By allowing jurors to answer questions privately and in writing,

jurors can express themselves more candidly than if asked the same questions as part of a large

---

3  The video is available at https://www.wawd.uscourts.gov/jury/unconscious-bias.   In addition to the Western
District of Washington, federal judges in the District of Oregon participated in the creation of a similar video that is
currently being shown in the state court system, available at https://www.courts.oregon.gov/how/Pages/jury.aspx,
and the Northern District of California uses a truncated version of the Western District of Washington video, *see*
https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors.     A disk containing all three
videos is enclosed with this letter.

4  Per the website, the video cannot be used without permission from the Western District of Washington. If this
Court allows counsel's request, counsel will request permission from the Court to use the video.

5  This video can be found at https://www.youtube.com/watch?v=ge7i60GuNRg. Judge Bennett (retired) of the
Northern District of Iowa had a practice of showing all prospective jurors this video as part of a presentation on
implicit bias. Jerry Kang et al., "Implicit Bias in the Courtroom," 59 UCLA Law Rev. 1124 (2012), 1181-83,
*available at https://www.uclalawreview.org/pdf/59-5-1.pdf.*

group, or if asked orally surrounded by the judge and two teams of attorneys.

The proposed questionnaire will also aid counsel in exercising peremptory challenges intelligently and without the need to rely on assumptions or uninformed judgments about potential jurors. The dual purpose of voir dire is to provide enough information to exercise challenges for cause and enough information to exercise peremptory challenges. *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).[6] Mr. Coleman's proposed questionnaire serves this same purpose. As one court has noted, "[p]eremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes." *United States v. Ledee*, 549 F.2d 990, 993 (5th Cir 1977).

Mr. Coleman proposes that the parties have two days to review the questionnaires once completed and confer as to any potential jurors they agree should be struck for cause or hardship. With approval of the Court, those jurors who the parties agree should be excused, will not have to return for further jury service.

III.    *Attorney-Led Individual Voir Dire*

Any jurors whom the parties and Court cannot agree should be struck for cause, shall be called back for voir dire. Mr. Coleman requests that voir dire be done on an individual basis and outside the presence of other jurors. This individual voir dire should relate to the individual juror's responses on the questionnaire. Reasonable follow-up questions related to the juror's responses should also be allowed.

---

6 *See also*, American Bar Association Principles for Juries and Jury Trials, 11(B)(3) (2005): "Voir dire should be sufficient to disclose grounds for challenges for cause and to facilitate intelligent exercise of peremptory challenges." Available at:
https://www.uscourts.gov/sites/default/files/aba_principles_for_juries_and_jury_trials_2005.pdf

Mr. Coleman further requests that this individual voir dire be attorney-led.[7] The Court

has discretion to allow attorney-conducted voir dire. Fed. R. Crim. P. 24(a) ("The court may

examine prospective jurors or may permit the attorneys for the parties to do so"). It has been

documented that attorney-conducted voir dire results in more candid answers from prospective

jurors. *See* Debora A. Cancado, *Note: The Inadequacy of the Massachusetts Voir Dire*, 5 Suffolk

J. Trial & App. Adv. 81 (2000); and Lee Smith, *Voir Dire in New Hampshire: A Flawed*

*Process*, 25 Vt. L. Rev. 575 (Winter 2001). One particular reason for this has to do with the role

of the judge during trial. As one set of commentators has noted, "the judge has an extremely

difficult role to fulfill, both intellectually and emotionally. He[or she] must be the arbiter of fine

points of law, coordinate the activities of all parties to facilitate a just result and remain above

interparty rivalries, all of which require that he remain aloof and emotionally detached." *See*

Suggs and Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 Ind. L.J.

245, 254 (1981). Attorneys are not so constrained. *See id.* These different roles are reflected most

superficially by the fact that it is the judge for whom jurors must stand upon his entry into the

courtroom, not the attorneys. Psychological studies show – consistent with common sense – that

people tend to be less willing to talk and reveal themselves to those who must remain at least

---

7 Attorney-conducted voir dire is the preferred method of selecting a jury in most jurisdictions across the country. *See* Debbie Swanson, "New Voir Dire Law a 'Victory for Fairness,'" 22 MASSACHUSETTS LAWYERS JOURNAL 1 (Sept. 2014), *available at* http://www.massbar.org/publications/lawyers-journal/2014/september/new-voir-dire-law-a-victory-for-fairness (noting that Massachusetts became the 40th state to allow attorney-conducted voir dire). The Massachusetts state legislature enacted legislation allowing attorney-conducted voir dire in all state superior court trials. M.G.L. c. 234 §28; *see also* Superior Court Standing Order 1-15: Participation in Juror Voir Dire by Attorneys and Self-Represented Parties, available at http://www.mass.gov/courts/case-legal-res/rules-of-court/superior/sup-orders/sup1-15.html. The American Bar Association recommends, "[f]ollowing initial questioning by the court, each party should have the opportunity, under the supervision of the court and subject to reasonable time limits, to question jurors directly, both individually and as a panel." American Bar Association, "Principles for Juries and Jury Trial" (2005) at 13, available at https://www.americanbar.org/content/dam/aba/administrative/american_jury/principles.pdf.

somewhat detached. *Id.* at 254-55.[8]

In addition, attorney-conducted voir dire will contribute to more complete information about each potential juror because the attorneys possess more in-depth knowledge of the case.[9] Important, necessary, and proper follow-up questions are more likely to occur to an advocate than a judge for several reasons, including the fact that a judge "does not have the advocate's awareness that soon he will be making peremptory challenges based on inferences from what prospective jurors have said," and the fact that "the judge does not know the case of either party in detail, so he cannot realize when responses have opened areas for further inquiry." Babcock, *Voir Dire: Preserving "Its Wonderful Power"*, 27 Stan. L. Rev. 545, 549 (1975). The Fifth Circuit has recognized:

> While Federal Rule of Criminal Procedure 24(a) gives wide discretion to the trial court, voir dire may have little meaning if it is not conducted at least in part by counsel. The "federal" practice of almost exclusive voir dire examination by the court does not take into account the fact that it is the parties, rather than the court, who have a full grasp of the nuances and the strength and weaknesses of the case … Experience indicates that in the majority of situations questioning by counsel would be more likely to fulfill this need [for information upon which to base the intelligent exercise of peremptory challenges] than an exclusive examination in general terms by the trial court.

*United States v. Ible*, 630 F.2d 389, 395 (5th Cir. 1980); *accord Corey*, 625 F.2d at 707; *Ledee*, 549 F.2d at 993.

---

8 *See e.g.*, Hon. Gregory E. Mize (ret.), Paula Hannaford-Agor, J.D., & Nicole L. Waters, Ph.D. for the National Center for State Courts and the State Justice Institute, *The State-of-the-States Survey of Jury Improvement Efforts: A Compendium Report*, April 2007, at 28 ("Empirical research supports the contention that juror responses to attorney questions are generally more candid because jurors are less intimidated and less likely to respond to voir dire questions with socially desirable answers."), citing Susan E. Jones, *Judge versus Attorney-Conducted Voir Dire*, 11 Law & Hum. Behav. 131 (1987), available at: http://www.ncsc-jurystudies.org/~/media/Microsites/Files/CJS/SOS/SOSCompendiumFinal.ashx

9 *See* Mize, supra, at 28 ("[A]ttorneys are generally more knowledgeable about the nuances of their cases and thus are better suited to formulate questions on those issues than judges.").

In addition, individualized, attorney-led voir dire will ensure that peremptory challenges are made for race and gender-neutral reasons. As noted by the Supreme Court:

> If conducted properly, voir dire can inform litigants about potential jurors, making reliance upon stereotypical and pejorative notions about a particular gender or race both unnecessary and unwise. Voir dire provides a means of discovering actual or implicit bias and a firmer bias upon which the parties may exercise their peremptory challenges intelligently. *See, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 602 … (1976) (Brennan, J., concurring in judgment) (voir dire 'facilitate[s] intelligent exercise of peremptory challenges and [helps] uncover factors that would dictate disqualification for cause'); *United States v. Whitt*, 718 F.2d 1494, 1497 (CA10 1983) ('Without an adequate foundation [laid by voir dire], counsel cannot exercise sensitive and intelligent peremptory challenges').

*J.E.B. v. Alabama ex tel. T.B.*, 511 U.S. at 143-44. More recently, the Supreme Court stated in *Pena-Rodriguez v. Colorado, "*Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations." 137 S. Ct. 855, 869, (2017). Litigants can no longer simply rely on their intuition and other preconceived notions about the fairness of a prospective juror in exercising peremptory challenges. Fairness dictates that the lawyers be permitted the opportunity to voir dire the jury panel to ensure that a fair and impartial jury is selected consistent with the dictates of *Batson* and its progeny because "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019); *see also Batson v. Kentucky*, 476 U.S. 79 (1986); *Georgia v. McCollum*, *supra*; *J.E.B. v. Alabama ex tel. T.B.*, *supra*.

<u>CONCLUSION</u>

For these reasons, Mr. Coleman asks that this Court show all potential jurors a video educating them on implicit bias and then distribute the proposed questionnaire. After the parties have had a chance to review the questionnaires and agree on any jurors who should be excused for cause or hardship, the defendant requests that the remaining jurors be called back for

11

individual, attorney-led voir dire. This proposed protocol will best ensure Mr. Coleman's rights

to an impartial jury and to a fair a trial.

> LOUIS D. COLEMAN, III
> By his attorneys,
>
> */s/ Wade Zolynski*
> Wade Zolynski
>   MT Bar No. 6088
> */s/ Jane Peachy*
> Jane Peachy
>   B.B.O. No. 661394
> Federal Defender Office
> 51 Sleeper Street
> Boston, MA   02210
> Tel: 617-223-8061
>
> */s/David P. Hoose*
> David P. Hoose
>   B.B.O. No. 239400
> Sasson, Turnbull, Ryan & Hoose
> 100 Main Street
> Northampton, MA 01060
> Tel: 413-586-4800 Ext. 107

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 22, 2022.

> */s/Jane F. Peachy*
> Jane F. Peachy