## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**UNITED STATES OF AMERICA**

**V.**                                          **CRIMINAL NO. 3:19cr-10113-FDS**

**LOUIS COLEMAN**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT'S SENTENCING MEMORANDUM

Mr. Coleman, a 35-year-old engineer with a once bright future and a loving family,

stands before this Court facing a mandatory life sentence following the jury's verdict convicting

him of one count of kidnapping with death resulting. He submits this sentencing memorandum

despite the mandatory sentence, to provide information about his life prior to the events of

February 2019, and to further explain his version of what happened on the night of the alleged

offense.

It is the paramount obligation of this court to impose a sentence that is sufficient, but not

greater than necessary, to comport with the purposes set forth in 18 USC 3553(a)(2). *See,*

*Kimbrough v. United States,* 552 U.S. 85, 101 (2007). In making its determination as to what that

sentence should be, the Supreme Court has instructed that the court consider all of the factors set

forth by Congress in subparagraphs (a)(1) – (7) of 18 USC § 3553. *Id.* Although no longer

mandatory, the Guidelines provide the starting point for determining an appropriate sentence and

in fact, must be considered by this court. *Gall v. United States*, 552 U.S. 38, 49 (2007). *United*

*States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008). The United States Probation Services has

prepared a Presentence Investigation Report (PSR) in which it has calculated the guidelines, and

determined that Mr. Coleman is a Level 43, Category I offender.   His imprisonment range per

the probation department's calculation of the Guidelines, is life which is also the sentence that is statutorily required. Mr. Coleman does not dispute that conclusion.  Despite statutory and caselaw directives to consider each of the § 3553 factors, there is little point in addressing most of them, given the lack of sentencing options available to the Court. For that reason, this Memorandum will be limited to just the first of the § 3553 factors: the history and characteristics of Mr. Coleman, and the nature and circumstances of the offense.

### *History and Characteristics of the Defendant*

#### *Family Background*

Louis David Coleman III was born on October 6, 1986, in Bakersfield, California. He was the first child for both Kellee Perry and Louis Coleman Jr.[1] The couple was not married at the time of his birth.

Kellee met Big Louis on the campus of California State University-Bakersfield in November 1981. They dated for a few months, but lost touch shortly after Big Louis failed to show up for a date. It turned out he had moved back to Los Angeles, where he was raised. For a time, they went their separate ways. They reconnected when, on an unrelated visit to Bakersfield a year or two later, Big Louis noticed Kellee working at a shoe store in the mall. They reconnected and somehow maintained a long-distance relationship, with Kellee in Bakersfield and Big Louis in Los Angeles, where he played in an NBA summer league and dreamed of a career in professional basketball. Both were surprised when Kellee became pregnant. They were still living separately when "Li'l Louis" was born in 1986.  After Louis was born, Kellee and the baby moved to Los Angeles, but her new job at the Department of Motor Vehicles, and Big

---

[1] To differentiate between the Defendant and his father, who share a name, the elder will be referred to as "Big Louis," as is the family's custom.

Louis's job at Home Depot still didn't net enough for them to afford their own place, so they continued to live apart as they saved for the future. Big Louis lived with his mother and siblings, while Kellee and the baby lived with an aunt and uncle.

In May of 1987, seven months after Louis' birth, Kellee and Big Louis married at Kellee's parents' home in Bakersfield and purchased the house across the street from Big Louis's mother in Los Angeles.

### *Parental Discord*

The marital relationship quickly became tenuous and fraught with accusations of suspected infidelity on both sides. In August 1989, just before Louis turned three years old, Kellee moved out. She got an apartment and a roommate for herself and Louis. Big Louis frequented the apartment, often uninvited. This arrangement lasted less than a year until, despite talk of divorce, Kellee became pregnant with their second child, and they reconciled. She and Louis moved back into the house across from Big Louis's mother. Louis's younger brother Justin was born in February 1992, making him over five years younger than Louis. Big Louis and Kellee went to one session of counseling, but neither was committed to digging deep into the challenges of their relationship, so the marriage settled into what is best described as an uneasy truce.

Although they lived in peace, it was a fraught peace. The family moved into a new house in a better neighborhood, known as Harbor City. The home was a split-level that allowed for two essentially separate households: Kellee and the children lived upstairs, while Big Louis slept and spent most of his time downstairs in a tv room. Extended family members frequently moved in for lengthy periods of time, thereby decreasing the odds that Kellee and Big Louis would have to interact with one another. And in fact, they interacted less and less as the years went on.

Though still legally married and living in the same house, to this day they communicate only through text messages, and then only when absolutely necessary.  When Louis was fourteen, they reconciled for long enough to produce their third child, a daughter who they named Mackenzie.  But the thawing of the relationship that produced Mackenzie was little more than a brief interlude.  All three children grew up knowing mutual sequestration as the paradigm for parental relations.

### A Father's Rejection & Violence

Louis has always felt a distance between himself and his father. He continues to feel that Big Louis blamed him -- or more precisely, his birth -- for foreclosing his dreams of a career as a professional basketball player.  Not surprisingly, Big Louis sees things differently and attributes the distance between him and his son as the result of differences in his and Kellee's parenting styles.  Big Louis ascribed to the idea that children must show unfailing respect to their elders, while Kellee was more concerned about empathizing with her child's perspective – something that had been sorely lacking in her own childhood. Big Louis felt Kellee coddled Louis; Kellee felt Big Louis didn't try to get to know or understand him.

Another wedge between Louis and his father was their divergent interests. Big Louis loved sports; Louis liked sports but gravitated more toward the realms of science, science fiction and fantasy. He enjoyed his science classes in high school, as well as classes in Japanese language.  He turned away from basketball when he didn't make his high school team, and began playing volleyball, a sport that he played competitively as well as recreationally right up until his incarceration on these charges.

Kellee and Big Louis's different approaches to parenting persisted into Louis's adulthood.  When Louis was in college and living at home without a job, his father felt he was

freeloading.  Kellee believed that as long as he was in school, it was their duty as parents to

support him.  After an argument with his father in 2011, Kellee suggested that Louis move out

just to avoid further conflict.  He did, cycling through two rented rooms over the next eighteen

months. When he moved back in at age 25, it was into the bedroom next to the room where his

father slept.  He took his mother's advice and dealt with his father just as she did: by maintaining

a co-existence yet avoiding contact as much as possible.  Still, they clashed occasionally for the

next several years.

In April of 2016, there was a major altercation between Louis and his dad resulting in

Louis' permanent departure from the Harbor City residence.  After sleeping in his car for a few

nights, his mother helped him find a room to rent and bought him necessary clothing and food.

### Supportive Friends in Childhood

Despite the standoff between his parents and his father's rejection and violence, Louis

managed to create a welcoming space in his home for friends, at least some of whom were

dealing with their own domestic struggles. High school friend Justine Kenoi, whose father had

recently died when she and Louis met, and whose mother suffered from bipolar disorder and/or

schizophrenia, was frequently homeless. She told defense investigators that she confided in

Louis, who let her cry and never judged her. She said that she felt safe with him and relied on

him to rescue her when she was stranded, which he did regularly. While other boys treated her

like a conquest, as she wrote in Louis's senior yearbook, "you treated me like a person—with

kindness and respect." And, although she didn't understand the specifics when he talked –

sometimes *ad infinitum* – about his career plans, she appreciated his career aspirations, which

were to contribute to society by inventing or discovering solutions to medical problems.

Damien Bauchum, who lived around the corner from Louis in Harbor City, experienced a similar sense of sanctuary with Louis. Damien lived with an abusive stepfather and lost his grandfather, the only adult who protected him, when he was ten years old. This was around the same time he met Louis. They didn't attend the same school until high school, but Damien spent many hours at the Coleman house to avoid the chaos in his own home. He and Louis passed their time by playing video games and watching sci-fi movies. Damien soaked up Louis's theories for scientific inventions, which Louis was all too willing to share. Damien told defense investigators that he and Louis would often talk late into the night, when Louis would suggest he just sleep on the floor of Louis's room, an offer Damien always gratefully accepted.

### Current Family Situation and Family Support

Louis remains very close with his mother. She supports him financially and talks to him over the phone or by text message as much as Louis is able. Despite having to travel the breadth of the country to visit, she has done so on several occasions since Louis was incarcerated and was present for the entirety of his trial. Kellee is employed as a Regional Manager for the California Department of Social Services, Community Care Licensing Division. Largely due to the costs of visiting and supporting Louis, she also works a second job as a shopper at Whole Foods.

Louis has spoken to his father only once, by telephone, since his incarceration on these charges. Big Louis still lives in the Harbor City residence and works at Lowe's, where he has been employed for seventeen years. He had previously worked for their competitor, Home Depot for twenty years.

Louis's younger brother Justin currently lives with his parents. Louis's ordeal over the past three and a half years has at times been too much for Justin, and it has been difficult for him to handle emotionally.

Mackenzie is now a senior at Azuza Pacific University where she stars on the soccer team. She is supportive of her brother and talks to him occasionally. She was present for the last few days of the trial.

*Other Supportive Family Members*

Louis is very close to several of his collateral relatives, and many have been supportive since his incarceration, especially his cousin Shandrea Daniel. Shandrea is Louis's first cousin on his father's side. She is an extraordinarily bright and capable young woman, who currently lives in Las Vegas, NV and works as a teacher and educational consultant. She is forty-two years old, single, and the mother of a seven-year-old daughter. She has been very supportive to both Louis and his mother since Louis's arrest. She has visited Louis at the Wyatt Detention Facility and talks to him by phone and text. She attended the last part of the trial.

Brittani Tilford is a somewhat "distant" cousin genealogically but very close to Louis in a more colloquial sense. Brittani works as an executive assistant at NBC in Los Angeles. She and Louis are close in age and share similar interests in comics and science fiction. Brittani was raised in Bakersfield and became close with Louis when she moved to Los Angeles for work. She describes him as always having been very smart and fun to be with. These charges were shocking to her because she had been to a club with him before and he was very protective of her. He seemed almost uninterested in women that were clearly expressing an interest in him. Brittani texts with Louis and sends him books when she can. She had hoped to attend the trial, but was unable to, in part due to the COVID delays.

Other family members with whom Louis remains close are his cousin Doniver Johnson who now lives in New Jersey after a stint in the military, his Aunt Brenda Coleman who works in the Los Angeles County District Attorney's Office, his Aunt Tonya Barnes-Woodward and his Aunt Shameil Coleman, all of whom live in the greater Los Angeles area.

The extended Coleman family is large and loving, and provides support not only to Louis directly, but to also to those family members – especially Kellee – who maintain more constant and direct relationships with Louis. Some of the support comes from long-time family friends such as Gail Peterson and Laska Mims.

*Education*

The stress from the tension in his home manifested itself in Louis's childhood development. He spoke with a stutter[2] from an early age and received speech therapy through first and second grade at Windsor Hills Math Science Elementary School. As an early learner, he struggled with self-confidence and lagged behind his classmates in reading and reading comprehension. Louis' academic performance as well as his confidence began to improve in third grade when his mother got him into the film business. She took this step with the hope that it would help with his stuttering. Kellee managed his auditions, and by the time he was eleven Louis was a member of the Screen Actors Guild. He appeared in a Steven Spielberg movie and in a couple of music videos.

Louis attended White Middle School, and then graduated from Nathaniel Narbonne High School in 2004. He struggled with his grades throughout high school, taking summer classes each year. Nonetheless, he developed a reputation among friends and family as an intellectual,

---

[2] Louis still has his stutter and remains very self-conscious about it. One of his greatest fears about his trial was that he would stutter if he had to testify or respond to questions from the court.

based on his verging-on-obsessive interest in science and science fiction.  Any quirks in his behavior were attributed to his superior intelligence, at least within his family, with others assuming that if he said something that didn't make sense, it was their lack of knowledge that prevented them from understanding, rather than any delusion or deficiency in Louis's thinking.

The transition from high school to college, at California State University at Long Beach (CSULB), was difficult for Louis. He lacked the skills to balance the various aspects of his life and did not acquire them easily.  His father insisted he get a job to offset the cost of his tuition and found him one at a Best Buy twenty miles from campus, by way of highways that were regularly clogged by the infamous Los Angeles area traffic. He also began his first significant romantic relationship at around this time and when it ended, he obsessed over that and the loss of his friendship with high school friend Justine, who had drifted off in her own direction. He dealt with the increased stress by playing a lot of volleyball and by beginning to drink. He was overwhelmed by stress induced by academic demands. To manage the stress, he turned to video games, which he sometimes played up to sixteen hours a day.

At the end of his freshman year, Louis was placed on academic probation, even after completing a semester of English remediation. Another semester later, halfway through his sophomore year, he remained in the same hole and was continued on probation. At the end of his sophomore year, in June 2006, he was dismissed from CSULB for academic failure. His academic dismissal was humiliating for Louis since his family had crowned him (absent any urging or desire on his part) a "genius." He could not bring himself to tell them about it. He had already moved back home after his sophomore year, so his change in academic status was not immediately obvious to his family.

Over the next two years, Louis enrolled in classes at Long Beach City College and through the CSULB Transitory Non-Degree Program. In November 2008, he applied for reinstatement at CSULB. He was admitted on probation, which he cleared by June 2009, and soon decided on physics as a major. Despite a fair number of class withdrawals and incompletes throughout his junior and senior years, Louis persisted and obtained his bachelor's degree in June 2012.  Feeling that he had finally hit his stride as a student, he went on immediately to the CSULB master's program in applied physics. He was invited to join Sigma Pi Sigma, a physics honor society, in 2014. He submitted his thesis, *Model Fitting and Residual Analysis as an Approach to Pulmonary Function Testing*, in December 2016, and ultimately received his master's degree.

### Substance Use

Louis first tried alcohol in high school when he did Jell-O shots with his volleyball team. He didn't like the taste and didn't get drunk. But on his twentieth birthday in his first year of college, his new friends urged him to do twenty shots; one for each year.  He did so, and predictably got terribly drunk. The episode seemed to serve as a gateway to further alcohol use. Partying – which almost always involved alcohol – became a significant factor in the trouble Louis had during his first two years of college, which as noted above led to his academic disqualification. Though he managed to focus better on his studies upon his reinstatement in 2008, he continued to party, sometimes drinking heavily. The defense team interviewed several of his friends, many of whom he met through volleyball who were also committed partiers.  They described Louis as having a low-key, sluggish reaction to alcohol.  He was not aggressive and the only times they ever saw Louis in conflict with anyone was when someone else initiated it. And even then, no one could ever recall him being in a fight.

Louis's credit card records, which the Government made use of at trial, show how frequently Louis attended nightclubs in Rhode Island and Massachusetts over the short time he lived there, but he probably did so no more often than any other single thirty-two-year-old man. Louis often engaged in the common practice of "pre-gaming," drinking at home prior to his departure for the clubs to make the evening more affordable.

In his efforts to make the best of his situation post-arrest and in acknowledgement of his history of issues with alcohol, Louis told a member of his legal team that he saw his lack of access to alcohol to be a benefit of his incarceration. He used it, he explained, to ease social anxiety that he felt had long been a problem for him, perhaps related to his stutter. While of course he would hardly choose incarceration as his preferred means to abstinence, he has realized he is better off without alcohol.

### *Employment*

Because he spent so many years in school and received educational grants and assistance from his mother, Louis's employment history is thin, prior to his move to Rhode Island in 2017. He worked for Best Buy as a sales associate for two separate periods, in 2004-05 and 2016. He left the first time because he was having too much trouble balancing his college life with a job, and the second time because of conflict with his supervisor that arose when he needed to take time off after his grandmother died. He had a short-lived job at a warehouse for the Albertson's grocery distribution center during the eighteen months he was on leave from college, but he left when the daily quota proved untenable for him. He also drove for Lyft for a short period of time.

Louis's job as a systems engineer at Raytheon was the result of his hard work in school. His supervisor, Jason Shelton, who testified at the trial, was on the hiring committee that interviewed Louis and decided to extend an offer of employment. He told defense investigators

11

that he believed that Louis could have had a long career at Raytheon. While Shelton maintained a strict policy of not fraternizing with his subordinates, he had lots of opportunity to observe Louis and never saw anything that seemed out of place or inappropriate.

Marcos Sostre-Cordoba was a higher-level supervisor of Louis—above Jason Shelton. He told defense investigators that he was very saddened to learn of Louis's arrest. He too was on the hiring committee that hired Louis and had no regrets in that regard. He remembered him as an ambitious, outgoing, and confident worker. Sostre-Cordoba remembered him as being very helpful to his female cubicle mate, who often asked Louis for help with computer language related questions. He observed no problems with Louis' relationships with the other female employees in his area. He had very high hopes for Louis and asked the defense investigator to convey to him that he was proud of the work that he had done there under his supervision.

### Prior Criminal Record

Louis has no record of convictions. He has been arrested twice. The Court heard about his arrest at the ComicCon event in San Diego on July 20, 2013. Louis was falsely accused of assault against the police after two officers body-slammed him and repeatedly struck him in the head, apparently for picking his cellphone up off the booking desk. The supposed assault on the police officer consisted of a scratch to his leg. The charges were ultimately dismissed, but Louis suffered significant facial injuries in addition to emotional trauma, significant enough that he sought out emergency medical treatment. The trauma of this experience, along with exposure to other stories of black men being mistreated by the police, created a distrust of the police in Louis.

12

His only other court appearance came about from his relationship with a former girlfriend who had stalked and repeatedly called him on numerous occasions[3]. The charges were dismissed.

### *Mental Health*

Louis and his college era friend Justen Speratos spent much of their time together partying, but Justen told defense investigators that he always thought that there was something going on beneath the fun-loving exterior that Louis presented. He sensed a deep internal insecurity. Louis didn't talk about his family or background, so Justen never knew what might have caused the sensitivity, but he could tell that Louis wasn't always as confident as he seemed, and that beneath it all he felt inadequate. In fact, Louis admits to experiencing increasing paranoia and anxiety as he grew older. Prior to his incarceration, he had never received mental health or emotional counseling. Louis traces much of his mental health struggles to the highly contentious and strained relationship he has with his father and to two of several incidents with him in particular. The first took place at age twelve or thirteen, when his father punched him in the face and put a knee on his neck. The second was years later, when his father pointed a handgun at him and threatened to shoot him. The impact that his father's brandishing a firearm had upon Louis' mental health cannot be underestimated. He lived in his car for days afterwards and told his mother Kellee that he considered suicide. When Kellee told Louis's Aunt Brenda about this comment on possible suicide, Brenda called to encourage him to seek therapy. She made the same suggestion after Louis found his father in a diabetic coma and called paramedics to save his father's life. Brenda felt frustrated over the years by the lack of communication

---

[3] The harassing nature of Ms. Yoo's pursuit of Louis was confirmed by friends of Louis's and by police reports made by his roommates at the time.

between the two men. She believed that a nearly fatal diabetic episode should have been enough to convince them to establish some modicum of a relationship.

Louis's anxiety and paranoia were exacerbated when San Diego police assaulted and beat him in 2013.[4] He also experienced emotional distress when his grandmother, with whom he was very close, died after suffering a series of strokes in 2016. Finally, at the time of the incident for which Louis was convicted, his mental well-being was also being affected by stress associated with the multiple security clearances needed for his employment with Raytheon, which required him to relive some of the stressful incidents in his past, such as the altercation with the San Diego Police. His mental health issues have at times manifested themselves in compulsive behaviors. He has been germophobic and obsessive about foods that he eats. A former girlfriend told defense investigators that Louis's paranoia was so severe that he insisted that she accompany him to pick up a car he had bought because he believed the seller secretly intended to physically assault him.

Since he has been incarcerated, Louis has engaged in psychotherapeutic counseling and began taking the psychotropic medication, Zyprexa, and two beta-blockers: propranolol and metoprolol. He has discontinued counseling but continues to take the medication despite being concerned about their side-effects.

### A. *Nature and Circumstances of the Offense*

The court heard trial testimony and legal argument that sketched out the essence of the defendant's version of the events in question. Aspects of the defense case are important to that

---

[4] A defense expert, Jeffrey Fagan, Ph.D., a professor at Columbia Law School, was prepared to testify to epidemiological studies that explain how negative interactions with police may cause young Black men to avoid law enforcement, and that the severity of the police assault is related to the reluctance to call the police, but his testimony was excluded by the Court.

night's events and will be set forth here. As suggested in pretrial filings and trial evidence, Louis led a very normal life for a single, healthy, thirty-two-year-old man. He had a good job and was popular among his workmates. When he was not working, he liked to go to the gym, and he also liked going to clubs. He socialized frequently at the Providence clubs but found them too "pub-like" at times and would travel to Boston's dance clubs for a more "urban" experience. He oftentimes went with friends from Rhode Island or met friends from Boston.

Although Louis had been out sick from work for much of the week prior to the night in question, there is no evidence to suggest that he used this time to stalk women or to plan criminal behavior with them. He sought medical assistance during the week, but on Saturday he felt better and went to the gym. After the gym, Louis contacted some friends to gauge their interest in going to Venu, a dance club he had been to before, but no one else had any interest. There was nothing nefarious about the time he arrived at the club. Indeed, Ms. Correia and her friends had arrived only a few minutes before and surveillance video at Venu showed a steady stream of people entering both before and after Louis did.

Once inside the club, Louis did not cause trouble. He conducted himself like other patrons in the club. He went to the bar, ordered a drink, and walked to the dance floor to take in the scene. Video surveillance shows that Louis was not stalking women. In fact, the woman he spent most of his time with (Lorna Horace) had approached him without Louis's solicitation. Surveillance shows her leading Louis around and through the club. She exchanged phone numbers with him, danced with him, and they kissed in the club's Latin Room. After leaving the club, she texted him saying he was "too good to be true."

Nor was Louis behaving in an aggressive manner. When Ms. Horace's brother, who was by his own admission somewhat overly protective, came between Louis and Lorna, Louis

15

stepped aside without hinting at an altercation. Mr. Horace testified that as her older brother he intended to make sure she went home with him and in his judgment, it was time to go.

There was also nothing sinister about Louis's behavior after leaving the club. As surveillance video shows, he hung around outside like many others before returning to his car to drive back to Providence. He strenuously denies that he preyed on Jassy Correia or that he "tricked" her into coming with him to his car. Moreover, he contends that the sexual act with Ms. Correia was entirely consensual. The Medical Examiner conceded at trial that she saw nothing to indicate forcible intercourse.

Ms. Correia's death resulted from a violent struggle initiated by Ms. Correia after consensual sexual intercourse. Ms. Correia was intoxicated on alcohol and cocaine that she likely consumed at Venu or shortly before arriving there. The levels of cocaethylene in her post-mortem blood could have led to violent and aggressive behavior according to toxicology experts that testified at trial. Evidence also showed that Ms. Correia had been diagnosed with bipolar disorder, that she was noncompliant with her medication regimen, and that she had previously exhibited violent behavior when in mental distress. These facts likely explain why she engaged in demonstrably aggressive behavior that evening by giving "the finger" to a bartender, fighting with her friend Ms. Mondesir, and telling another friend, Ms. Hiltz, that she intended to fight Ms. Mondesir, before being persuaded to not do so while inside the club. Moreover, she and Ms. Mondesir continued pushing and shoving each other on the sidewalk before Ms. Correia tried to commandeer an Uber that she had not hailed, by banging on its windows, threatening to call the police on the driver, and entering the vehicle's passenger seat without permission before getting pushed torso-first onto the sidewalk. All of this took place in full view of several onlookers. At one point Ms. Correia removed her shoes to better enable her to engage in fighting. Even after

16

being ejected from the Uber, Ms. Correia yelled at the driver, slapped his car, and threw what appeared to be ice or snow at his windshield.

All of Louis's behavior after Ms. Correia's death is consistent with his having no previous plan to harm her.  Faced with her dead body in his car and given his fear of the police, he simply panicked and took her to his apartment where under significant emotional distress he remained for 72 hours as he tried to figure out what he should do.

### Conclusion

Louis recognizes that the Court has no options regarding his sentence.  He asks the court to recommend to the Bureau of Prisons that he serve his sentence at USP Tucson, which will be most convenient to his family members, all of whom are on the West coast.  His mother, a life-long California resident intends to retire next year and relocate to Arizona for health reasons.


THE DEFENDANT

By   /s/   David P. Hoose
DAVID P. HOOSE,  BBO#239400
SASSON, TURNBULL, RYAN & HOOSE
100 Main Street
Northampton, MA  01060
(413) 586-4800
(413) 582-6419 (fax)
dhoose@strhlaw.com

/s/ Wade Zolynski
Wade Zolynski
 MT Bar No. 6088

/s/ Jane Peachy
Jane Peachy
 B.B.O. No. 661394
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061

17

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this Sentencing Memorandum, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David P. Hoose

David P. Hoose, Esq.